Let them get seated and situated. All right, it looks like whenever you're ready, Mr. Harrison.  My name is Jeffrey Harrison. Appellants ask this court to reverse. The prior panel held Morocco's judicial system was fundamentally fair and compatible with due process and observed that the record does not establish any improper influence on the Moroccan court in this case. DeJoria makes today the same arguments based on the same record that he made in the prior appeal three and a half years ago about tributals, safety, counsel, and experts. He comes with no new evidence. He disavowed the need for additional discovery. No expert supports any aspect of his due process challenge. And as before, he relies on speculation and innuendo. I would like to discuss. You read the prior opinion as allowing additional discovery and evidence? Is that the implication of the prior opinion? I believe that if a request were made below, the magistrate would have granted it, but DeJoria expressly disavowed that. I'd like to discuss DeJoria's waiver of his due process challenges under this court's Turner decision, and I'd like to discuss his failure to meet the burden of proof. But first, the standard of review. The prior panel held the standard of review is de novo, yet DeJoria's brief refers to clear error 16 times. In the prior appeal in the West courtroom. There's my problem on your reliance on that prior appeal for the standard of review. There, as the panel held in reversing, the panel said the statute only looked at system-wide, is Morocco unfair? Does it violate due process system-wide? And to me, that's clearly, that's a legal question that would be de novo review. Now, because of this new statute, I know you're challenging the new statute, but if it is going to be decided under the new statute, the new statute says, there's a new provision that says, you can look at whether due process was violated in this particular case, things like whether there was counsel. And that seems to me to be a fact question. What happened in this case? You need a fact finder to determine that. So why isn't that a distinction with the prior standard of review? Sure, in the prior appeal, what DeJoria was trying to do was what Chevron, Donziger, and Osorio Dole did. There was no specific proceeding challenge allowed under New York and Florida law. And what happened in those cases were that Chevron and Dole stayed in what they thought were grossly unfair proceedings in Ecuador and Nicaragua, established a robust evidentiary record of their own specific proceeding, due process failings, and persuaded the courts to find a systemic failure and hence non-recognition. That's exactly what DeJoria tried to do here. As he argued in the 2015 appeal, quote, a system-focused analysis must take specific circumstances into account. Please look, Judge Costa, at record 4092, 4112, and 4159 note five, all DeJoria's writings on that point. In addition, in the prior appeal, DeJoria argued that, quote, the bulk of the district court's judgment is factual findings, and those should be reviewed under the clear error standard, like a bench trial. That's record 4910 to 12. The panel expressly disagreed and held 379 and note two that the standard of review is de novo. That issue- The panel disagreed with the other side and said, we look system-wide. I mean, that was the whole debate, wasn't it? System-wide versus case- It really wasn't, Judge. The debate there was whether DeJoria met his burden of proof as it is here, and he used heavily his specific proceeding, or so he called them, arguments to try to make out a systemic challenge, as in Chevron and Dole. That issue was squarely presented and decided. There was no bench trial here. There was no evidentiary hearing here. Society of Lloyds versus Turner. How is someone supposed to- I mean, isn't whether someone could get a lawyer, which is one of the key issues in this case, I know there's a big debate about it, how's that not a fact issue? I just don't see how that's not a fact issue. Putting aside what prior cases have said, why is that not a fact issue? So it's a question of whether or not DeJoria has met his high burden of proof to show a due process failings, and one of his arguments is he claims an inability to meet counsel, to get counsel. I'd like to address that, but that is something that this court did three and a half years ago, and this court should defer to, but can look at again, that DeJoria does not have the evidence to make out that challenge. That's precisely what this court does under DeNovo review, and frankly, Judge, under a clear error review, because DeJoria does not have the evidence to meet his burden of proof. I'd like to discuss counsel, but first if I could lay the context, because in addition to whether DeJoria meets his burden of proof, the counsel question looms large on his waiver under Society of Lloyds versus Turner, where this court held that it, quote,  of a party who was given and waived the opportunity to participate in the foreign proceedings. And so the question, DeJoria's answer to that, his only answer, is he could not participate because he couldn't get counsel. DeJoria admitted in the prior argument, record 4913, that he made a strategic decision not to participate in Morocco, and instead to wait until the judgment came to Texas for recognition. Turner's flat rejection rule is sensible and fair, particularly for a sophisticated litigant like DeJoria, who was a founder and director of a Moroccan oil company, who agreed in writing to Moroccan law and jurisdiction in Morocco courts, who forfeited the opportunity to participate in trial and Judge Costa on appeal in 2013, when he does not even contend he could not hire counsel. So let's look at his excuse. He couldn't get a lawyer, he says. DeJoria has a heavy burden of proof here. The prior panel at page 380 said that the compatible with due process language sets a, quote, high bar for non-recognition. Indeed, the Texas Act presumes recognition as the default rule. That high bar carries over from the system challenge to the specific proceeding due process challenge. Indeed, the only federal circuit court to entertain such a specific proceeding challenge, the Ninth Circuit, in its 2017 decision, Midbrook-Flower-Bulbs v. Holland, the most exciting Dutch tulip case this side of the 1600s, explained that the requiring only fundamental fairness and basic fairness carries forward to the specific proceeding challenge. So what's the evidence in the record on counsel? No expert supports DeJoria's counsel unavailability story. DeJoria and Skidmore in fact hired Moroccan lawyers, Azzedine Catani, Amina Benbrick, Tariq Mosaddegh, and as this prior panel noted at 383 and note 11, Baker and McKenzie. None of them say they would not have represented DeJoria at trial or on appeal. No Moroccan lawyers say they declined to represent him at trial. No Moroccan lawyers or lawyers anywhere in the world say they would have declined to represent him in 2013's full de novo appeal with new evidence and arguments available to him. The prior panel rejected DeJoria's counsel availability argument. Page 382, DeJoria's ability to retain counsel in Morocco contrasted sharply with Pallavi's inability to retain counsel in the Ayatollah Khomeini's post hostage crisis Iran. Page 383, DeJoria's company Skidmore retained Azzedine Catani as counsel at the outset of this dispute. Page 383, Moroccan law expert Khabaz testified that, quote, many attorneys would have been willing to represent DeJoria in the Moroccan court lawsuit. Note nine, five out of seven of the defendants were absolved even though none appeared or had counsel. Page 389, the prior panel held, quote, DeJoria could have litigated entirely through counsel without returning to Morocco. Now, DeJoria and the magistrate are dismissive of that, saying that's just personal jurisdiction. Personal jurisdiction is a fundamental due process issue as the prior panel noted on the prior page 388. So what's DeJoria's evidence? As in 2015, he bases his argument on two non-Moroccan lawyers, Francis Bernard Desai and Norway's Gunnar Nørdrum. Desai's letter and Nørdrum's declaration express concern about people going to and entering Morocco. They say nothing about Moroccan lawyers defending in Moroccan court. Please look at record sites 2854 and 2857. Nørdrum, the Norwegian lawyer, admits he arranged for Moroccan attorney Amina Ben-Brik to attend Moroccan proceedings for Skidmore, Desai's company. Skidmore's general counsel, James Harvey, admits, record 2851, that he authorized the hiring and paying of Amina Ben-Brik and gave her documents to deliver to court-appointed expert Cordale. Ben-Brik herself wrote to the court and to expert Cordale, I represent Skidmore, record 4875 and 4879. Ben-Brik's colleague Al-Abbasi also attended expert meetings on behalf of Skidmore and Desai, record 23. What all of that does seem to me, they were able to obtain counsel around the periphery, but when it came to the guts of challenging the foolishness of the king, they could not get a lawyer or there's evidence that they could not get a lawyer that would push this case the whole way to challenge the integrity and intelligence and reign of the king. Judge Jolly, there is no evidence of that. Desai has the burden. Well, there is the evidence of the, shutting down the newspaper and only coming back whenever they apologize for making the king look foolish. I mean, that's- Judge, I believe that- I don't know how far they are, but that's the thing that- I understand that. They go in their favor. Thank you, Judge, for pointing that out, because I think that Le Journal Nissan story is important, and I'd like to direct the court to record 3544 to 46, where we discuss that in some detail. Because there, the evidence is so thin and hearsay, based on Arabic language online paper, Elof running some story about a voluntary suspension, record 1508, of this newspaper, because of its unethical violations of journalistic integrity by reporting a story that was found to be utterly lacking in support, record 1508. That's the basis for Judge Nolan's statement. And it is utterly inconsistent with what this prior panel found in note nine, that notwithstanding the peripheral noise that DeZoria makes, there was no evidence in this record of any influence by the king in this specific proceeding. And that is a compelling point that that- That's a finding of the previous panel. It's really not, Judge, because what that is, is DeZoria uses the term fact-finding. Please look at that, page 26 to 27 of these so-called adopted findings. Those are conclusory assertions, Judge. I meant for that to be a friendly question to you. I'm sorry, Judge? I meant for that to be a friendly question to you. I appreciate the friendship. I'll take it when I can get it, and I'm sorry I didn't embrace it right off the front end. I embrace it now. But I want to address your counsel point just a little bit more. And that is, where is the evidence that Moroccan lawyers in the seven-year trial from 2002 to 2009 refused DeZoria? He's a billionaire with unlimited resources. His company filed a parallel Texas case claiming this was a $3 billion dispute. He had lawyers in London, the predecessor to Denton's, in France, in Norway, and the U.S. Where are the declarations from any of them that they tried to hire counsel and could not? Where are the dozens of rejection emails, letters, after-the-fact declarations from any Moroccan lawyer saying they would not? There's really three reasons the district court gave for finding that this violated due process. One is the lawyer issue you're talking a lot about. One was DeZoria not being able to go to Morocco himself, and then three was an impartial tribunal. I know you disagree, obviously, with all three of those, but do you agree with them that only one of them is necessary to show a due process violation? I do not, Judge. A couple things. First, on the personal appearance death threat story based on hearsay that's un-evidenced, and if we look at Corain v. Barr, last week's decision of this court, where threats that are exaggerated, nonspecific, and lacking in immediacy are insufficient, that's what DeZoria has here with his hearsay story through Gustin. But even the magistrate acknowledged that the- You may not have heard Judge Costa's question. I did, I'm sorry. Here I come with it. Even the personal appearance bit- All I got to prove, asking you if you're- You agree with them that they only need one of those to be upheld to win? I don't, Judge. I don't. You're making the burden heavier on yourself than it otherwise would be. No, sir. I'm not. The burden is squarely and heavily on DeZoria, but he can't meet those challenges. Could I just answer that point, though, if I could? And that is, in the personal appearance story, even the magistrate acknowledged that appearance can be in person or through counsel. It devolves to counsel. And as to the expert story, even the magistrate acknowledged that, in isolation, it's not troubling. We'll talk more in a few minutes. On the impartiality, you've got the newspaper story Judge Jolly mentioned. You've also got these findings about the experts, and how, you know, that whole story. But we want to respond to the district court finding that the experts, they just kept going till they could find an expert who would agree. I do, briefly, thank you. And that is that the judge did not need, in Morocco, to appoint experts to award damages. Look at Record 4587. He could have done that anyway. DeZoria and Nolan, Judge Nolan claimed that this was some preordained result. That's plainly not right. The expert story is that the Moroccan court took pains to provide due process protection by looking for an expert who would do the work. The prior panel in note nine, cited the appointment of the experts, plural, as evidence supporting due process. And Judge, this is not some abstraction. We have Cordale. We have his 69-page report. Cordale relied on KPMG's underlying reports identifying DeZoria's fabrications and misrepresentations and fraud. Cordale notified and invited DeZoria and his lawyers to appear, and they did not. Morocco gave him the protection of hiring his own expert, of challenging the report or challenging the appointment, and appealing de novo entirely in 2013. He did none of that. That you are representative of this court, that in order to show that you would deny due process, you've not only got to appeal that, I mean, that they would, you've not only got to show that the district court erred in saying that they could not get an attorney, but you've also got to show that the district court erred in these other two matters that Judge Costa was referring to. Judge, I think that in order to prevail here, DeZoria has to overcome the prior panel's case-specific findings, and the magistrate was not free to ignore what the prior panel found. There were case-specific findings there, Judge. Okay, I mean, I just, we're still not connecting, but that's okay. I'd really like to, though. I know, but maybe we were on the wrong. All right, look forward to it. Let me ask one question. You haven't mentioned anything about retroactivity of the newer statute. You don't have any concerns about that for purposes of your argument here today? I have great concerns about that, but I'm also mindful that Judge Jolly, with Judge Costa on the panel in Hochey v. Burwell just three years ago, noted that this court must avoid declaring a constitutional issue if there's some other ground upon which the case may be disposed of, and we think Society of Lloyds v. Turner waiver, and on the merits, his failure to meet the burden of proof does that, but yes, we are deeply concerned about that, Judge. It is an issue in the case. It's a challenging issue. I'll give you two minutes. I'll give two extra minutes to the other side if you want to address that, just so then they'll have a chance then to respond to what you say. Thank you, Judge. So the Texas Supreme Court's 2010 decision in Robinson created these factors and noted there was, quote, a heavy presumption against retroactive laws. In the few cases where retroactivity has been upheld, the courts have identified a crisis that required attention, a legal crisis, a medical malpractice crisis. There was no such crisis here. Even the magistrate noted that this was the result of DeGioia's lobbying so that he had another bite at the apple, which he's pursuing now, based on the same arguments and record. We think it still fails. The second and third factors are similar, the nature and impairment of rights. The old act protected due process rights in Texas and around the country for decades and still does. The magistrate found, though, at page six of his opinion, that the 2017 act, quote, had a direct impact on this case. Indeed, DeGioia sought retroactivity precisely to try to better his lot here after he lost in 2015. This is not some procedural change. There is a procedural change in the statute. That is, how you actually file for recognition at 36.0041. This is a substantive change that allows a new argument, which DeGioia is making. The Texas legislature, in its retroactivity, focused only on the DeGioia case, and DeGioia's lawyer, who didn't say he was a lawyer in this case, said he couldn't identify any cases that might be affected. This was targeted at this case. We are not quarreling with the Texas legislature's adoption of the 2005 Uniform Act. We're quarreling with the retroactive application, something no other state has done, and the Uniform Act itself says you don't do. Thank you for the two minutes. All right, well, you'll get your four minutes for rebuttal, thank you. Mr. Street? I see you're splitting the argument. Do you want the extra two minutes, or is Mr. Enoch? I'll take the extra two minutes. All right, just put him on for 15, then, please. And you'll have seven, Mr. Enoch. May it please the Court, Aaron Street on behalf of the applee, John Paul DeGioia. As Judge Costa noted, I'll be addressing for 15 minutes whether the district court properly refused to recognize the judgment under the updated act. Mr. Enoch will address the constitutional challenge to the act, as well as any other points I don't get to. Turning, first of all, to the standard of review. As Judge Costa's questions, I believe, indicated, in the previous DeGioia opinion, the Court stated the standard of review as de novo because it was reviewing there the ultimate legal question of whether Mr. DeGioia had proved his case for non-recognition. And in that case, a purely legal question drove the outcome, whether the Moroccan inquiry was system-wide or specific to Mr. DeGioia. Now, Mr. Harrison says that we argued that case-specific findings should be relevant to that system-wide question, but this Court squarely rejected that argument and said, we will not parse the particular judgment. We will look at the system as a whole. And the only question before the Court was whether the Moroccan system was dysfunctional or completely violative of the rule of law such that no judgment could be recognized from Morocco. Counsel, you didn't think that there was a need to bring forth any additional evidence or expert testimony or any other matters to put in the record after the case went back to the District Court or to the magistrate? We were confident with the record that we had based on Judge Nallon's findings and based, I think it's shown to be justified, based on the District Court's later findings that Mr. DeGioia was unable to obtain counsel, could not personally appear, and suffered additional aspects of the impartial tribunal violation by the cycling through of the experts. Now, I think both sides agreed that that record was sufficient. If this Court has any questions about that, we certainly could go back and put on more evidence. What other arguments do you have in regard to that other than the three that were mentioned here when your opponent was at the podium? I'm not sure I understand the question. What other arguments do you have regarding the unfairness or the lack of due process other than the things we talked about, counsel, things of that sort? I think we've put on our case with respect to the absence of counsel and the inability to appear and the impartial tribunal. I'm simply saying that if the Court had some question of some additional proof that needed to be made on one side or the other, that could be adduced below. But we think under the clear error review that applies to factual findings by a District Court, this evidence is more than sufficient to sustain the judgment. Do you have any Texas cases applying clear error under this statute? Yes, the Texas version of clear error. The Morrillus v. Hector case from the Dallas Court of Appeals in 2018, which we cite in our brief, states very clearly that in the judgment recognition case, the Court of Appeals reviews with deference the trial court's resolution of factual disputes. And I think it's very telling that Mr. Harrison's brief completely misstates that case on the reply and says that the Court did not decide the standard of review. What the Court did not decide was whether the ultimate question of recognition was reviewed de novo or abuse of discretion. But as we quote in our brief, the Court squarely said, regardless of what standard of review applies to the ultimate question, we deferentially review factual findings of the District Court. And that deferential standard of review is consistent with Texas case law dating back to the landmark case of BMC Software v. Marchand, which says regardless of whether there's an evidentiary hearing or whether the case is decided on the papers, Courts of Appeals always review the factual findings of a trial court deferentially. I mean, frankly, I have a lot of problems with the fact that you say you could not get counsel. And I have a lot of problems with, for instance, I mean, these statements about physical safety seem very vague and indefinite, unsupportable. The fact that there was really no effort that I saw in the briefs for you to ever seriously try to get counsel, you would cite all of these reasons that you did not try to get counsel, but there was no real effort to do it. The experts testified very strongly that counsel was available, and I don't think you put on any experts to say that it was not available. So let me walk through the evidence there in direct answer to that question. I mean, there's a lot of other evidence here. I mean, it just seems to me not to be supportable. Why didn't you appeal the case, for example? Let me first address the counsel issue and then the appeal directly. Well, it's all of it, really. I mean, I just think you... Because we strongly disagree that the evidence is lacking here. First of all, the district court looked at all of this. For example, why didn't you challenge the, expert testimony? I mean, the fifth witness on damages. Because you're not allowed to relitigate the underlying merits of the case. We were allowed to make a due process argument. Why didn't you present it to the district court here to show, I mean, that somehow this was part of the lack of due process because they went through five experts before they finally got a reading on damages, and you just make that a general assertion without showing that the fifth expert's analysis was completely unsupportable? Or even, you didn't want anybody on to challenge it. Your Honor, that would be a complete relitigation of the merits of the case. What we did show... I understand that, but that seems to me what you would have needed to have done, or if he were a bogus expert, it would have certainly helped your case in terms of allowing due process. We're simply not allowed to do that, but what we did point out, and I think it undermines the... You were not allowed to do that? That's what the comments to the Uniform Act say because the focus is on the process, and what we did point out... Well, did you offer it to the district court to say, look, I mean, this is the evidence that we have that this expert's testimony is totally unsupportable, and indicated that he was part of the rigged process that we're claiming that was there. The strong evidence on that point is the fact that you had three experts who were appointed, and the judgment says they were not able to reach an affirm opinion on the question. We don't know why. That's correct, and the fourth expert is appointed, and he's dismissed. We have no idea why, and then finally, the fifth expert is appointed, but he's not able to get evidence from both sides. We don't have counsel. We're not able to appear to present that evidence. It all folds into the fact that you didn't try to get counsel. You didn't make any real effort to get counsel. So let me strongly disagree with that and try to walk through briefly some of the evidence, and then- I'll read the briefs at this time, and you- Yes, and I think the court can go back and read the district court's opinion on this point, because I think it does walk through the evidence very carefully, which I'll do briefly, but first of all, I think we start with the district court's factual finding, which is DeGioia was, in fact, unable to obtain counsel to represent him due to the fact that he was a defendant in a case of great political interest to the king, and his interests were adverse to the king. Now, here's the sufficient evidence that supports that. It's directly contrary to what you heard this morning, which was a re-argument of the district court case. Mr. DeGioia reached out to multiple Moroccan counsel, Mr. DeGioia or his Skidmore colleagues. He reached out to multiple foreign counsel who were licensed in Morocco, and all of them rebuffed him, and these are not- Reached out, what do you mean reached out? He asked him to represent them in the litigation, and I would point out a couple specific, case-specific points on this, Your Honor. Record 2851, Ms. Ben-Brick, who never entered an appearance in the litigation. Ms. Ben-Brick, quote, pointedly advised and warned on more than one occasion that any appearance by Skidmore or any personal representative of Skidmore in the Moroccan lawsuit would be dangerous. He asked her, is it, or is it she? Yes. Asked her to ever represent him? Yes, the general counsel of Skidmore reached out on behalf of all of them and said, and on that same page I cited, Ms. Ben-Brick says, the GC of Skidmore says, Ms. Ben-Brick specifically declined to formally represent Skidmore, and as I think Your Honor alluded to- And that is the same as refusing to represent the appellant here. Yes, and they were all treated together for purposes of retaining the counsel. You had Mr. Gustin reaching out on behalf of all of them, and I think it goes to this, Your Honor's previous question, that you did have counsel before the litigation started. Mr. Catani said, sure, I'll represent you in your shareholder dealings, but once the litigation started, he received a mysterious package of documents that conflicted him out of the case. Ms. Ben-Brick was willing to review documents in the case, but she specifically was unwilling to enter an appearance in the court. I thought the attorney who conflicted out said, look, I am conflicted out, but I will be glad to assist you in finding any other counsel that will represent you, and there was no effort, as I understand it, made to proceed from there to find other counsel. There is substantial effort throughout the course of the litigation. What you're referring to is way back in 2001, before there was even a lawsuit. We have evidence from 2003, 2005, 2007. I'm talking about the one that conflicted out. Yes, that was in 2001, before there was even a lawsuit, and Mr. DeGioia goes back in 2003 and tries to find multiple counsel. In 2005, he goes out. In 2007, there are multiple... If I'll find that in the record, then you've answered the question. I just did not see it or understand it from the briefs. Let me give you... There were specific instances in which he was saying, well, let me tell you, other people tried to get counsel. They couldn't get counsel. So I took it on myself to say that I couldn't get counsel either because these other people were being denied counsel under these circumstances. His partner, Mr. Gustin, was reaching out on behalf of Skidmore and DeGioia, and the letters that are in the record say, it would be unwise and unsafe for anyone to go to Morocco to represent Mr. DeGioia or Mr. Gustin or Skidmore. So all of that evidence goes to DeGioia and is very specific in saying it's unsafe and unwise to go. And that's why the district court who looked at all of this evidence found on that point. And if the court reviews the district court's findings, they're all supported by citations. I can give you the evidence with respect to another Moroccan lawyer, Mr. Manny. Skidmore is repeatedly reaching out to Mr. Manny and saying, will you represent us? And he never responds. They send again, will you represent us? He never responds. That's at 4883 to 87. There's a French attorney who's licensed in Morocco to say, because I might not be saying that right, who denies representation and then also says, it's unwise for any lawyer from any country to plead against the Highness Prince and his partners to argue that anyone descending from Mohammed did not keep his word. Yes. So he was not only rebuffed, he was told nobody is going to represent you in this case, both by Moroccan counsel and by the French counsel. Wasn't it considered one of the great benefits of this deal at the outset? I'm going back even further. To have a member of the King's family as part of this conglomerate or enterprise, wasn't that considered a benefit? It seems like it was much ballyhooed that this venture included the strong companies and individuals in the United States and then the King's relative was going to be involved with his entity. Sounds like it works when everything's going great, but then when the deal apparently encounters some problems, all of a sudden it's like an immunity. You're arguing that it's an immunity from ever having to appear in court in Morocco, the fact that a member of the King's family is involved. Isn't that your argument? That is not our argument, Your Honor. And I agree completely. It was a great idea to have a member of the King's family involved. The King himself personally recruited investors. The King went on TV and touted this find. That all shows the King's intense personal interest in this case. It makes it a very unusual case. It's not every time the King has an interest in the case. It's every time the King has put his credibility and reputation on the line and been directly involved in this case to the point of shutting down newspapers that disagreed with him. And then when there are objective indicia in the record that the King's interest in the case had an effect on the proceedings, the cycling through the experts, the inability to obtain counsel, the death threats. That's gonna be a very narrow- What's the record site? Maybe you covered this with Judge Jolly, but what's the record site that the cycling through experts was directly related to a position that the King took or a statement that the King made? Right, so there's not that sort of direct link, but the district court drew the reasonable inference from the evidence, all of the evidence that was presented, that that was yet one other bullet point or data point that showed the King's influence and the awareness of the judiciary of the King's desired outcome in this case. Now, let me turn back briefly. I think Judge Jolly had a question about the appeal. Why didn't they appeal? Concerns me too. Yes, and first of all, I think it's important to set up the legal framework for where the appeal is relevant in this analysis. If you look at section C-8 of the updated act, it says the due process question applies to the specific proceeding leading up to the judgment. That's the trial in the case. And then the comment to C-8 in the Uniform Act clarifies that if there's an appeal available and the evidence establishes that the appeal could have been a sufficient way to correct the transgressions at the district court, then that will only be a discretionary factor that the district court can consider in deciding whether to recognize the judgment. So even if the court believes the appeal is available, which I hope I'll get to briefly, that would simply have kicked it to the discretion of the district court who already heard all of the evidence about the appeal and found Mr. DeGioia could not have gotten counsel and could not have appeared on the appeal. So that wouldn't be a ground for reversal in any event. But let me touch briefly on the state of the evidence at the time of the appeal. There is no evidence in the record whatsoever that anyone was willing to represent Mr. DeGioia in Morocco at the time of the appeal. What he did was retain experts and retain Baker and McKenzie to pursue an American lawsuit. That is far different from participating in a Moroccan proceeding that directly calls into question the King's credibility and interest. And I also point to the Dessai Declaration, the French attorney in Morocco who specifically says, in 2013, quote, it still would be unsafe to go to Morocco to represent Mr. DeGioia. There's no countervailing evidence to that other than vague expert declarations that the district court was well within its discretion to discredit. Right. I also understand they had experts that testified that counsel was available and described it in some detail, as I read the briefs, some detail, that it was available. You put on no counter expert to show that counsel would not be available and relied upon these anecdotal instances of why it was not available. Is that correct? Three points on that, Your Honor. The expert testimony put on by MPE and MFM was not specific. It was simply somebody would have represented him. They did not identify a single attorney who would have represented him. They did not say we would have represented him. We were confident to stand on our specific evidence that we reached out to multiple foreign and Moroccan attorneys who not only rebuffed us but said it would be unsafe and unwise to represent you in this case. And what I think MPE and MFM is arguing and maybe what Your Honor's question is getting at is why did, you know, the argument seems to be, well, Mr. DeGioia just didn't want to have counsel. He made a strategic decision to try to litigate this in the U.S. And the district court said that just doesn't make sense. He has plenty of resources to hire counsel. He tried to get counsel and yet nobody entered an appearance for him. And the argument that there's some strategic decision, I heard that in the opening, that is based on a complete misrepresentation of the previous oral argument in this case. That's not in the record. In the oral argument, the previous counsel said Mr. DeGioia would not go to Morocco in 2013 and put his life at risk in a sham proceeding, not that he made a strategic decision to go to the United States to litigate this case. So we would ask that the judgment be affirmed. All right. We'll go for Mr. Enoch now. I appreciated the question about the electoral activity. Gave me some relevance to my part of the argument here. May it please the court, my name is Craig Enoch. I also do represent John Paul DeGioia here. I want to give the court a little bit of history so we can understand the Robinson factors on the retroactivity question. Back in 1895, the U.S. Supreme Court in the Hilton case created a comity discussion on when to recognize foreign judgment. In their discussion, they identified two things to be paid attention to, the due course of proceedings in the trial court and the system in the country that supports those proceedings. So there were two. In comity, it was due process in the trial court proceedings and a system consideration. In 1915, the Texas Supreme Court in the, I guess it's the Monero case out of Mexico, adopted that comity. In the trial court proceedings, it's a fair proceeding. And in the system, it's a fair system. In 1961, the Uniform Laws Commission codifies that, brings it into a statute to uniformize the state laws on comity. So they take comity into the statute, or so we think, into the statute. By 1981, when Texas was adopting it, the majority of state systems had adopted the Uniform Laws. So now with the new law and the retroactivity challenge, one of the Robinson factors is the public interest. Do we look at the public interest generally or the public interest in having the law apply retroactively? I think you look at the significance of the public interest generally, but then you weigh that against, why does it appear to kind of apply before its effective date? So I do think it's a combination of things. How important is this public interest? And then relative to what harm it causes, to whom it applies, if it applies before essentially its effective date. Robinson says, there's the three factors, but it says really retroactivities. You look at expectations, and then it says you look at whether the legislature's targeting a party or specific parties. And it does look here that this was done for one specific case. So if you can respond to that concern, that it directly implicates what Robinson says is the reason the Constitution prohibits retroactive legislation. Well, actually, there are three cases that it applies to, and we'll later report. What's the other one? I knew this one, the bankruptcy. The bankruptcy case and one out of Fort Worth that we just discovered. But actually, the Texas Supreme Court just this past September said, if it just applies to two cases, that is not the final determination of whether it's retroactive. They still do the balancing. What's the interest being protected, and what's the ultimate harm? Going to really address that question, that's why the history is important here. In 2005, in 2005, the Uniform Laws Commission updated the statute. Why did they update the statute? In the commentary, it says because there was some confusion and inconsistent court decisions about what the statute was applying to. What were the provisions they changed? One is, well, was it supposed to attach to a weird cause of action, or was it supposed to attach to a judgment that was not rendered in the due course of proceedings? And the other one was, was the proceeding itself conducted according to the due process of the individual? Because there was some confusion in the courts on exactly system and exactly on what the judgment they're referring to. And now we come forward, and we have 2015, we have this court's decision, which says the Texas statute is strictly a system statute. We're going to look to see if Morocco could not give a fair trial to anybody at any time. And we're going to look at the evidence. There is no evidence that Morocco could not give fair proceedings to anybody at any time. The legislature says we have the same problem. We have our Texas citizens who, under our statute, comity, bringing it forward in the direct proceedings in the system, is now saying it only applies to system. We want our citizens to have the protections of personal due process. The statute gets amended and comes on forward. Yes, they refer to this court's decision, 2015, because it is doing the very thing that the Uniform Laws Commission commented was the problem in the old statute. When Texas adopted it, it was the 23rd state to adopt it. It wasn't the first. It was the 23rd. Now there's 25 states. Going to the question of retroactivity, cases are legion. It was the only one to make it retroactive. Well, let me offer this to you. Is that right or no? Well, let me offer this to you. This court, legions of cases say, if a procedural rule changes. Was it the only one? Well, I would say that it's not actually retroactive. This court has said, if a procedural. The brief defends it on retroactivity. We did and the state does. Tell us why. The courts have often said, if it's a procedural change, it's not outcome determinative, it's a procedural change. It would apply to cases pending at the time the rules adopted. You could have had this statute without even that provision in there, because quintessentially, procedural due process is not, as Mr. Harrison said, it's not notice. Procedural due process is the opportunity, the fair opportunity to appear and be heard. We didn't have that in this case. This statute, even if it says it's effective going forward, I would make the argument it's a procedural statute and should apply to any pending case. Looking at the Robinson factors, McGrath was never entitled to have a trial against Mr. DeGioia that didn't provide Mr. DeGioia due process. They were never entitled to that. We had a statute that was not correct on how we assured the individual due process was protected. I think the Supreme Court, in Texas Supreme Court, would be clear under Robinson. Due process is important. I've tried another case involving the Dealer's Act. It's pending with the Supreme Court. Should we wait to see if that flushes out retroactivity analysis? I think Robinson will not get any better opinion than Robinson on that. And I just say Robinson say the personal due process in the trial court is a significant interest. Do you know the timing of that case that's now at the Texas Supreme Court? Any estimate? I know it'd just be an estimate. I don't know the timing of the case. I've heard about it. The court generally tries, if they argue it during the year, they tend to have the opinion out by June. OK, thank you, Mr. Renick. Thank you. Judge Costa asked for a case in Texas citing clear error. They give you Marillis. Marillis does not even mention clear error. Marillis was an evidentiary hearing, unlike this case. And there the court expressly said, we do not need to determine what standard applies. This was a cold paper record. And we cite the cases in our brief Villa Gomez, First, and Bison at reply three and four, that those are de novo. Texas cases on de novo review, Judge, they are Legion, Southwest Livestock, Diamond Offshore. This prior panel cited Presley, Sanchez, Redding, and Bates. Also, the Courage and Kempshire. Texas law is de novo review. Counsel. The prior panel held, I gave the cites in my opening presentation, addressed the issue on counsel availability. And squarely found counsel was available, and DeGioia could have litigated entirely through counsel without returning to Morocco. This court held that. Amina Benbrick. Counsel says she was unwilling, citing Skidmore's Harvey's declaration hearsay. Look at what Ms. Benbrick herself wrote at record 4875 in her 2007 letter to the Moroccan court. I want to notify you that I represent Skidmore Energy. Please enter my appearance on its behalf with permission to allow me to photocopy all documents and the file in order to be able to prepare the defense for my client, period, end quote. Look also at record 165. But she just observed, is that the? She provided documents to expert Cordelli as well. I have a question. Did she just observe, or did she participate in litigation? No, I don't think she participated. DeGioia actively tried not to participate as a strategic decision. What do you say about Desai, who did decline representation and then says no one's going to go against the king because you're questioning the word of Muhammad? Yeah, I say a lot about Desai. First, Desai wasn't licensed or didn't practice in Morocco. That's a misstatement in the findings from Judge de Magistrate. Look at Desai's declaration at 2914, and Nerdrum, for that matter, at 2856. Neither one say they were licensed to practice or practiced in Morocco. And as to Desai, please do. That's why I gave the record sites in the opening. As to what they say, they don't talk about trying to contact any Moroccan lawyer except for Amina Ben Brick. And Nerdrum says she was willing to do the work, did work, and did say she was appearing, publicly holding herself out as representing Skidmore, as did her al-Abbasi colleague. Your general position, I mean, especially given the amendments of the Texas statute on retroactivity and so on, is that generally, you can get due process in Morocco. Absolutely. But not in this case. Absolutely, you can in this case. You can generally, but not in this case. Well, I think you can and Desai could have in this case, for sure. He could have had lawyers. He had all these due process procedures available to him. In 2013, he had the appeal de novo that he didn't take. And there's no evidence they tried to get any lawyer to represent him. Judge Costa, you asked, who were the Moroccan lawyers that you tried to retain? I think that was your question. He gives you two. One, Ben Brick, who did work for Desai and Skidmore. And two, Hamadi Mani, who in July and August 2007 didn't respond to cold call emails from Judge James Harvey, the GC of Skidmore. That's their evidence. In 2013, they have no lawyers. That does not carry a burden in what they thought was a $3 billion dispute. There's a high bar they have to meet. And when they talk about this notion of political influence and the king being opposed, the king wasn't involved in this case. The public statement from the king was in the year 2000 about finding oil. There's no public statement about this case from 2002 through 2013. There was no statement when the judge Wasn't the whole case about whose fault was it that this oil didn't pump like that? No. I know the allegations are there was misaccounting. But they're going to defend it and say, that isn't why we weren't making money. It's because the king wasn't telling the truth when he said this was a gusher. That wasn't what the case was about. It is this fiction that they have bought in at the magistrate level, despite this court's footnote 9. Judge Jolly, footnote 9 is a finding of the prior panel of this court. And it makes all of that noise because this court found no influence. Last point, if I could. One sentence, I'll give you to wrap up. My god, it's going to be a long one with lots of semicolons. No, I'm not. Judge Costa, in this case, if you look at the objective evidence, and we lay it out in our reply brief, pages 21 to 22, and you contrast that to the Chevron, Donziger, and Dole Osorio case, where the president of Ecuador put his thumb on the scale publicly and repeatedly, where Nicaragua's government passed a special law targeting that litigation. You covered this in your brief, didn't you? It is. It is. And judge, it's just that is the kind of high bar evidence necessary in de jure economic disburden. Thank you to both sides. Thank you very much. Please be seated, and the court is at recess. Thank you.